**AMERICAN MUTUAL LIFE IN-
SURANCE COMPANY and
Subsidiaries, Appellee,**

v.

**UNITED STATES of America, Appellant,**

The Stock Company Information
Group, Amicus Curiae.

No. 94–1440.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 10, 1994.

Decided Dec. 15, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied March 21, 1995.*

David Pincus, Washington, DC, argued
(Michael L. Paup, Gary R. Allen, David I.
Pincus, Edward T. Perelmuter and Don Car-
los Nickerson, on the brief), for appellant.

Matthew J. Zinn, Washington, DC, argued
(Matthew J. Zinn, J. Walker Johnson, Theo-
dore R. Groom and Holly K. Hemphill, on
the brief), for appellee.

Mark D. Mittleman, St. Louis, MO, and
William B. Harman, Jr., John T. Adney and
David L. Wunder, Washington, DC, on the
brief of amicus curiae the Stock Co. Informa-
tion Group in support of the appellant.

* Hansen, Circuit Judge, took no part in the consid-     eration or decision of this case.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

The issue in this case is whether Congress intended to give mutual life insurance companies so-called dividend deductions greater than their dividends in any given year. The court concludes that Congress did not so intend, and therefore reverses the judgment of the district court.

### I.

Appellee American Mutual Life Insurance ("AMLI") is a mutual life insurance company. AMLI sued the government for a tax refund, claiming that the Internal Revenue Service improperly calculated its income deductions for the year 1986. The district court granted summary judgment to AMLI, concluding that the statute allowed AMLI the full amount of the deductions it claimed. The government has appealed, asserting that the district court's reading of 26 U.S.C. § 809 violates congressional intent.

Section 809 is an attempt to isolate the taxable component of dividends that mutual life insurance companies like AMLI make to their policyholders. Mutual life insurance companies make dividends to their policyholders that contain both taxable and untaxable components. The taxable component is the distribution of earnings to owners; the untaxable component consists of price rebates to customers. The dividend that mutual life insurance policyholders receive is not easily broken into its components because mutual life insurance companies do not have separate groups of stockholder owners and policy-holding customers. The customers own the company. By contrast, stock life insurance companies pay earnings to stockholders as nondeductible dividends, and refunds to their insurance policyholders as deductible price rebates.

Section 809 is thus designed to identify the taxable component of mutual life insurance company dividends. It imputes income to mutual life insurance companies based on actual rates of return on equity experienced by stock companies, and requires mutual life insurance companies to reduce their deductions to reflect an imputed distribution of earnings to their policyholders.

Section 809 requires a comparison between an imputed stock company rate of return before the payment of stockholder dividends (the "imputed earnings rate"), and a mutual company rate of return after the payment of policyholder dividends (the "average mutual earnings rate"). Section 809(c)(1), (d), (e). The mutual company rate of return is based on two-year-old data. Congress theorized that the difference between these two rates was attributable to equity returns distributed to mutual company policyholders and that the difference provided a basis on which to adjust the income of mutual life insurance companies. The excess of the imputed earnings rate over the average mutual earnings rate produces a "differential earnings rate" which is multiplied times the individual company's average equity base for the year to produce a "differential earnings amount." Section 809(a)(3), (b)(1), (c)(1). This amount represents the earnings component of the mutual company's dividend. The mutual company then reduces its policyholder dividends deduction by the differential earnings amount. Sections 808(c)(2), 809(a)(1).

Second 809 is quite complex, not only because it relies upon numerous calculations, but because it relies in part on an average of the earnings rate of mutual companies for the taxable year, a figure that is not available until a year after that the tax is due. As a result, section 809 requires two computations in each of two tax years: the first is made the year the tax is due, and the second is made the following year. The first makes a preliminary calculation of the deduction based on average mutual company earnings data from two years before. *See supra.* In the second calculation, a "recomputed differential earnings rate" and a "recomputed differential earnings amount" are calculated based on the difference between the imputed earnings rate for the prior year and the average mutual earnings rate for the prior year. Section 809(c)(1), (f)(3). If the differential earnings amount exceeds the recom-

puted differential earnings amount, the excess is allowed as a "life insurance deduction" in the following year. Section 809(f)(2).

We stress that the recalculation is merely a means of achieving a result that was not possible to calculate in the tax year. The first calculation represents the method by which Congress intended to tax mutual life insurance companies; the second calculation is merely a housekeeping measure to reflect the updated data.

## II.

The tax year in question is 1986. On its federal income tax return for 1986, AMLI reported a 1986 differential earnings amount of $9,826,925. AMLI arrived at this figure by multiplying the 1986 differential earnings rate of 10.539 percent by plaintiff's 1986 average equity base of $93,243,430. The 1986 differential earnings rate was reckoned as the difference between the 1986 imputed earnings rate (16.285%) and the 1984 average mutual earnings rate (5.746%). Pursuant to sections 808(c)(2) and 809(a)(1), AMLI reduced its policyholder dividends deduction for 1986 by the differential earnings amount, from $13,985,737 to $4,158,812. These figures are not in dispute.

The following figures are in dispute. For the subsequent tax year, 1987, AMLI claims a 1986 recomputed differential earnings amount of *minus* $1,580,476. AMLI arrived at this figure by multiplying the 1986 "recomputed differential earnings rate" of −1.695% by AMLI's 1986 average equity base of $93,243,430. AMLI calculated the 1986 recomputed differential earnings rate as the 1986 imputed earnings rate (16.285%) minus the 1986 average mutual earnings rate (17.980%). AMLI therefore claims a life insurance deduction for 1987 of $11,407,401, the 1986 differential earnings amount of $9,826,925 minus the 1986 recomputed differential earnings amount of negative $1,580,476.

The government denies that AMLI is entitled to subtract the negative $1,580,476 because this will give AMLI deductions greater than its dividends. According to the government, neither the recomputed earnings rate nor the recomputed differential earnings amount can be negative. Thus, AMLI's life insurance deduction for 1987 should be $9,826,925. The government argues that AMLI is attempting to obtain a tax windfall because, while its 1986 dividends are $13,985,737, it is claiming total deductions of $15,566,213 for 1986 ($4,158,812 taken in 1986 and $11,407,401 taken in 1987).

## III.

■ A review of the statute and its legislative history suggests that AMLI is not entitled to deduct an amount greater than its dividends.

■ 1. The purpose of the statute is to reduce mutual companies' deductions by imputing income into dividends that would otherwise be fully deductible. The title of section 809 reflects this purpose: "Reduction in certain deductions of mutual life insurance companies." So does the legislative history. *See* H.R.Rep. No. 432, 98th Cong., pt. 2, at 1422, *reprinted in* 1984 U.S.C.C.A.N. 697, 1067. In addition, section 808 provides that, regarding mutual companies in particular, "the deduction for policyholder dividends for any taxable year shall be reduced by the amount determined under section 809." Section 808(c)(2). AMLI's position is that it is entitled to a deduction *enhancement.* The statute and the legislative history suggest otherwise.

■ 2. The statute specifically limits the deduction for policyholder dividends for any taxable year to an amount equal to the policyholder dividends paid or accrued during the taxable year. For mutual companies, this amount should be further reduced according to section 809.

(c) Amount of deduction.—

(1) In general.—Except as limited by paragraph (2), the deduction for policyholder dividends for any taxable year shall be an amount equal to the policyholder dividends paid or accrued during the taxable year.

(2) Reduction in case of mutual companies.—In the case of a mutual life insurance company, the deduction for policyholder dividends for any taxable year shall be reduced by the amount determined under section 809.

Section 808(c). AMLI's reading of the statute increases its deductions to an amount greater than its dividends for the 1986 tax year. The district court believed that section 808(c) did not apply to limit section 809(f), because the recalculation set forth in section 809(f) was a "life insurance deduction" rather than a deduction for a "policyholder dividend." The district court believed that the 809(f) recalculation was a separate "other deduction" allowed under the catch-all provision of section 805(a)(8).

There is no material distinction between "life insurance deduction" and "policyholder dividend deduction" under the facts of this case. Under section 804, "life insurance deductions" are the general deductions available in section 805. Section 805 provides for several kinds of life insurance deductions, including policyholder dividends that have been calculated under section 808(c), but specifically provides that "[e]xcept as provided in paragraph (3), no amount shall be allowed as a deduction under this part in respect of policyholder dividends." The 809(f) recalculation simply modifies the section 809 policyholder deduction that was calculated in the prior year, and functions as an adjustment "in respect of policyholder dividends." Hence, the requirements of section 808(c) must apply to section 809.

■ 3. Neither the recomputed differential earnings rate nor the recomputed differential earnings amount should be negative. The negative recomputed differential earnings amount arises here because of the recalculation of the differential earnings rate under 809(c)(1) and (f)(3). The recalculated rate is defined as the "excess" of the imputed earnings rate for the taxable year "over" the average mutual earnings rate for the taxable year. For the tax year 1986, this rate turned out to be negative. AMLI argues that the statute allows for a negative "excess." Indeed, in past years, the Internal Revenue Service acknowledged the possibility of a negative excess.

Congress, however, assumed that the imputed earnings rate (based upon stock company data) would always exceed the average mutual earnings rate. In designing section 809, Congress "determined that the average pre-tax return on equity of mutual companies falls below that for a comparable group of stock companies." H.R.Rep. No. 432, 98th Cong., pt. 2, at 1422, *reprinted in* 1984 U.S.C.C.A.N. 697, 1067. This is the operative assumption behind the section 809 formula. It turned out to be wrong in 1986 (and, according to the parties, several succeeding years as well). But whether Congress was right or wrong in its assumption, it expected, and thus intended, that "excess" would be a positive number.

The term "excess," moreover, is more susceptible to a reading as a positive number than as a negative number. The statute states that the desired figure is the "excess" of A "over" B. This is the same as asking for the amount by which A exceeds B. If B is greater than A, there is no excess, and the amount by which A exceeds B is zero. AMLI's argument that the concept of "negative excess" has some specialized industry meaning, and that Congress intended that "excess" carry this meaning in section 809, is not convincing. "Language used in tax statutes should be read in the ordinary and natural sense." *Helvering v. San Joaquin Co.,* 297 U.S. 496, 499, 56 S.Ct. 569, 570, 80 L.Ed. 824 (1936). Section 809, moreover, for the reasons already explained, did not anticipate a "negative excess."

4. AMLI asserts that section 809(f) reflects a statistical formula under which mutuals are overtaxed in some years and undertaxed in others. AMLI maintains that Congress envisioned a scheme in which the mutuals' deductions even out in the long run, even if the deductions in any one year are greater than the dividends, because mutuals' deductions are less than the dividends in other years. AMLI points to the rolling three-year average of stock company data used to calculate the imputed stock rate as evidence that this was the congressional intent. This is an intriguing theory, but there is no evidence that this was what Congress had in mind. Rather, it seems more likely that section 809(f) reflects nothing more than a method of evening-up the prior year's incomplete data. *See* H.R.Rep. No. 432, 98th Cong., pt. 2, at 1425, *reprinted in* 1984 U.S.C.C.A.N. 697, 1070. There is no indication whatsoever that it serves any greater purpose as a statistical calculation of earnings trends over time in the life insurance industry. *See id.*

■ 5. After the district court issued its decision, the Internal Revenue Service issued regulations stating that neither the differential earnings rate under section 809(c) nor the recomputed differential earnings rate that is used in computing the recomputed differential earnings amount under section 809(f)(3) may be less than zero. The regulation is effective for all taxable years beginning after December 31, 1986. *See* 26 C.F.R. § 1.809–9. For the reasons already outlined, this regulation is a reasonable interpretation of the statute. Treasury regulations are entitled to great deference, and must be sustained unless unreasonable and plainly inconsistent with the revenue statutes. *Commissioner v. Portland Cement Company of Utah,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981). While AMLI objects to the government's reliance on a regulation promulgated since the district court's decision, disregarding the regulation would have availed AMLI nothing. The court's conclusion would have been the same, for the regulation embodies the proper interpretation of the statute.

### IV.

For the foregoing reasons, the judgment below is reversed.