**CUNA MUTUAL LIFE INSURANCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 96–369 T.

United States Court of Federal Claims.

Oct. 31, 1997.

Matthew J. Zinn, Steptoe & Johnson, Washington, DC, for plaintiff.

Robert J. Higgins, U.S. Department of Justice, Washington, DC, for defendant.

## OPINION & ORDER

HODGES, Judge.

Plaintiff CUNA Mutual Life Insurance Company seeks a refund of an alleged federal tax overpayment. The United States contends that the Internal Revenue Code and the Treasury regulations interpreting the Code do not entitle plaintiff to a refund. We must defer to the interpretation of the Code provided by defendant's regulation absent circumstances not present here. Plaintiff is not entitled to a refund under that interpretation.

## BACKGROUND

### I.

Plaintiff claims entitlement to policyholder dividend deductions totaling $33,379,532 with

respect to its taxable year 1986. About $20 million of this amount was deducted in 1986 and $13 million in 1987. Plaintiff's actual policyholder dividends for 1986 were only $31,459,629 however. Plaintiff claims deductions for 1986 policyholder dividends that exceed the amount of such dividends paid or accrued by approximately $2 million. Defendant disputes this "excess" $2 million deduction.

Section 808(c)(1) of the Internal Revenue Code permits a deduction equal to the policyholder dividends paid or accrued during the taxable year. Section 808(c)(2) reduces that deduction according to a formula provided in § 809. The central issue is whether the § 809 formula used to calculate the § 808(c)(2) reduction in the § 808(c)(1) deduction may result in a negative value. A negative value increases plaintiff's deduction.

## II.

Section 809 is part of an elaborate formula designed by Congress to provide for roughly equal tax treatment of stock life insurance companies and mutual life insurance companies.[1] Mutual life insurance companies issue dividends that include both taxable and untaxable components. The taxable component is the distribution of earnings to owners; the untaxable component consists of price rebates to customers. The dividend that mutual life insurance policyholders receive is not easily broken into its components because mutual life insurance companies do not have separate groups of stockholder owners and policy-holding customers. The customers own the company. By contrast, stock life insurance companies pay earnings to stockholders as nondeductible dividends, and pay refunds to their insurance policyholders as deductible price rebates.

Section 809 is designed to identify the taxable component of mutual life insurance company dividends. If the taxable component were not isolated, mutual life insurance companies would obtain a competitive benefit vis-a-vis stock life insurance companies.

Section 809 imputes income to mutual life insurance companies based on actual rates of return on equity experienced by stock companies. It requires mutual life insurance companies to reduce their deductions to reflect an imputed distribution of earnings to their policyholders. The rate of imputed stock company return before the payment of stockholder dividends (the imputed earnings rate) is compared with a mutual company rate of return after the payment of policyholder dividends (the average mutual earnings rate). *See* § 809(c)(1), (d), (e).

The mutual company rate of return is based on two-year old data. A comparison of the two rates should reflect the amount of equity returns distributed to mutual company policyholders, and supply a basis upon which to impute income to mutual life insurance companies.

The excess of the imputed earnings rate over the average mutual earnings rate generates the "differential earnings rate." That rate is multiplied by the individual company's average equity base for the year to generate a "differential earnings amount." *See* § 809(a)(3), (b)(1), (c)(1). The differential earnings amount—the earnings component of the mutual company's dividends—is subtracted from the company's policyholder dividends deduction to produce the mutual company's actual deduction. *See* §§ 808(c)(2), 809(a)(1).

Section 809 operates in phases because the calculations rely on an average of the earnings rate of mutual companies for the taxable year. This figure is not available until a year after the tax is due, so the process takes two years. In the first year, a preliminary calculation determines the deduction based on average mutual company earnings data from two years before. A "recomputed differential earnings rate" and a "recomputed differential earnings amount" are calculated in year two, based on the difference between the imputed earnings rate for the prior year and the average mutual earnings rate for the prior year. *See* § 809(c)(1), (f)(3). If the differential earnings amount exceeds the recomputed differential earnings amount, the

---

**1.** The discussion in this section regarding the mechanics of the statute is substantially the same as that appearing in *American Mutual Life Ins.*

*Co. v. United States,* 43 F.3d 1172, 1173–74 (8th Cir.1994), *cert. denied,* 516 U.S. 930, 116 S.Ct. 335, 133 L.Ed.2d 234 (1995).

excess is allowed as a "life insurance deduction" in the following year. *See* § 809(f)(2).

### III.

Congress may have assumed that the mutual rate never would exceed the stock rate. That is, a negative recomputed differential earnings rate and a negative differential earnings amount would not occur. Nonetheless, in 1986 the average mutual earnings rate exceeded the imputed earnings rate. The "excess" of the mutual rate over the stock rate resulted in a negative recomputed differential earnings rate and differential earnings amount. This *increased* the deduction now claimed by CUNA. Such a result is not permitted by the regulation.

### DISCUSSION

### I.

Plaintiff acknowledges authority directly contrary to its position here. *See Indianapolis Life Ins. Co. v. United States,* 115 F.3d 430 (7th Cir.1997) (Easterbrook, J.); *American Mutual Life Ins. Co. v. United States,* 43 F.3d 1172 (8th Cir.1994), *cert. denied,* 516 U.S. 930, 116 S.Ct. 335, 133 L.Ed.2d 234 (1995). Both cases found that the recomputed differential earnings rate cannot be negative. Plaintiff counters this adverse precedent by noting that the Eighth and Seventh Circuits used different analyses when they decided not to allow mutual life insurance companies to enjoy policyholder dividends deductions in excess of the policyholder dividends paid or accrued during the same taxable year. *See Indianapolis Life,* 115 F.3d at 436 (basing decision in part on deference to Treasury regulation); *American Mutual,* 43 F.3d at 1174–75 (basing decision on legislative history grounds).

In fact, a review of the district court's opinion in each case shows that four distinct analyses were used. *See Indianapolis Life Ins. Co. v. United States,* 940 F.Supp. 1370 (S.D.Ind.1996), *aff'd,* 115 F.3d 430 (7th Cir. 1997); *American Mutual Life Ins. Co. v. United States,* No. 4–92–70347, 1993 WL 556786 (S.D.Iowa Nov. 2, 1993), *rev'd,* 43 F.3d 1172 (8th Cir.1994), *cert. denied,* 516 U.S. 930, 116 S.Ct. 335, 133 L.Ed.2d 234 (1995).

Many of the arguments pursued in those cases have surfaced here. The proper effect of 26 C.F.R. § 1.809–9 is the dispositive issue.

### A.

■ We cannot invalidate Treasury regulations unless they are unreasonable and plainly inconsistent with revenue statutes. *See Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698–699, 92 L.Ed. 831 (1948). They will not be overruled except for "weighty reasons." *Id.* Courts must defer to regulations that implement congressional intent in a reasonable manner. *See Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045–1046, 67 L.Ed.2d 140 (1981); *Qantas Airways Ltd. v. United States,* 62 F.3d 385, 387 (Fed.Cir.1995), *cert. denied,* 516 U.S. 1112, 116 S.Ct. 910, 133 L.Ed.2d 841 (1996).

### B.

■ The regulation at issue in this case provides as follows:

§ 1.809–9 **Computation of the differential earnings rate and the recomputed differential earnings rate.**

(a) In general. Neither the differential earnings rate under section 809(c) nor the recomputed differential earnings rate that is used in computing the recomputed differential earnings amount under section 809(f)(3) may be less than zero.

Plaintiff argues that § 1.809–9 is unreasonable because it reflects an attempt to limit the meaning of the statute, at odds with its origin and purpose. Plaintiff's position is that the statute, apart from the interpretation provided by such regulations, does not preclude a negative excess. The Eighth Circuit stated that "Treasury regulations are entitled to great deference, and must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *American Mutual,* 43 F.3d at 1176 ((citing *Portland Cement,* 450 U.S. at 169, 101 S.Ct. at 1045–1046)). The *American Mutual* court did not address the regulation in detail, having found that the statutes preclude a negative excess of their own force *Id.*.

The plaintiff in *American Mutual* objected to the fact that the regulation was promulgated after the district court's decision in that case had been issued. *Id.* The Eighth Circuit ruled, "disregarding the regulation would have availed [plaintiff] nothing. The court's conclusion would have been the same, for the regulation embodies the proper interpretation of the statute." *Id.*

The Seventh Circuit relied specifically on the regulation. The court stated,

> When the Internal Revenue Code is ambiguous, a court must respect the Treasury Department's interpretive regulations, if they "implement the congressional mandate in some reasonable manner."

*Indianapolis Life,* 115 F.3d at 436 ((quoting *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979))). It is perhaps charitable to view §§ 805, 808, and 809 as ambiguous at all, "given the number of times § 809 uses the word 'excess' in a way that must be greater than zero." *Indianapolis Life,* 115 F.3d at 436. Assuming that such an ambiguity in the statutes exists, plaintiff's argument nevertheless fails.

The Eighth Circuit found that the statutes "of their own force" do not permit a negative excess, a determination that the Seventh Circuit found to militate strongly against a finding that the regulation is unreasonable. *See id.* Likewise, this court cannot say that the result of the Eighth Circuit's consideration of the meaning of the statutes alone was unreasonable. The Seventh Circuit's deference to the regulation also is difficult to ignore. In the circumstances presented here, we cannot find that the regulation is unreasonable or plainly inconsistent with the statutes.

## II.

Plaintiff provides additional points to cast doubt upon the regulation, or to impugn the process by which it was promulgated. Plaintiff did not devote a large portion of its time during oral argument to these allegations, and briefing on this issue does not provide much authority to support them.

According to plaintiff, 26 C.F.R. § 1.809–9 is a "fighting regulation." IRS first an-

nounced that it would issue the regulation in 1988. A proposed regulation was not promulgated until after the complaint in the *American Mutual* case was filed in 1992. The district court decision in *American Mutual*—favorable to the taxpayer—was issued on November 2, 1993. The final regulation was promulgated on December 10, 1993, "not to arrive at a correct interpretation of the statute, but rather to buttress the government's litigating position," according to plaintiff. This argument did not impress the Seventh Circuit. *See Indianapolis Life,* 115 F.3d at 436. The Supreme Court recently dismissed the notion that an agency cannot promulgate a regulation during the pendency of a lawsuit: "Nor does it matter that the regulation was prompted by litigation, including this very suit." *Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, ——, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25 (1996).

In its cross motion for summary judgment, plaintiff stresses that "[b]y the time it issued the final regulation in 1993, the IRS had stated six times that regulation would proscribe negative recomputed [differential earnings rates]. In the first four instances, the statements as to what the final regulations would say were made *before* the *proposed* regulations were even promulgated." (emphasis in original). Plaintiff argues that

> From 1988 through 1993 the Service embraced inconsistent positions, first announcing a negative rate, then stating that the calculated rate was negative but could not be used, and finally claiming that the rate was not negative under the "plain language" of the statute. Given this history, it is fair to conclude that the regulatory process employed was a result-oriented, nondeliberative one in which an outcome adverse to mutual companies was foreordained.

■ Plaintiff's argument appears to be on one hand that the Government's position regarding negative differential earnings rates was inconsistent, but on the other hand that the Government's position became too consistent to be the result of a deliberative process. The Supreme Court has held that "the mere fact that an agency interpretation contradicts a prior agency position is not fatal." *Smiley,*

517 U.S. at ——, 116 S.Ct. at 1734; *see also Appalachian States Low–Level Radioactive Waste Comm'n v. O'Leary,* 93 F.3d 103, 110 n. 7 (3d Cir.1996) (applying *Smiley* ). We cannot impute nefarious motives to the Government based on inconsistency alone. As noted, the fact that a regulation may be prompted by litigation does little to bolster plaintiff's argument in this regard. *See id.* at ——, 116 S.Ct. at 1733. The regulation at issue was promulgated before this case was filed. The Government points out that the IRS gave notice of the proposed rule making, invited comments, and held a public hearing.

Plaintiff questions the stated purpose of the regulation included in the notice of proposed rulemaking, which purportedly is to "provide guidance to mutual life insurance companies" regarding recomputed differential earnings rates. *See* 57 Fed.Reg. at 37,-495. According to plaintiff, there was no need to provide guidance, given that "IRS's position was known to each affected mutual life insurance company and to the specialized IRS personnel with responsibility for enforcing the provisions of the Internal Revenue Code applicable to life insurance companies." Plaintiff argues that as a result, there was no "needful" purpose for IRS to issue the regulation. We cannot find authority for the contention that a final regulation may be invalidated for being redundant or unnecessary.

Plaintiff notes that IRS reorganization in 1991 eliminated the division between its regulation and litigation functions. Now, the IRS closely coordinates the issuance of regulations and the litigation of cases. Plaintiff argues that such coordination makes the regulation at issue here—a post reorganization regulation—inherently suspect. The Government points out that this argument would invalidate practically every regulation promulgated after 1991, an untenable result.

### III.

In sum, the Treasury Regulation is not unreasonable or inconsistent with the Internal Revenue Code, and therefore is entitled to deference. We cannot find a "weighty reason" to overrule the regulation at issue here.

■ Plaintiff's economic argument is compelling, despite defendant's contentions to the contrary. The testimony of Dr. Boskin, for example, suggests that to measure the differences between the stock and mutual life insurance companies over a span of years, negative recomputed differential earnings rates must be taken into account. The possibility exists that the practice of not allowing negative differential earnings rates introduces a source of non-neutrality into § 809 that works to increase the mutual life insurance industry's tax burden as compared to that of the stock life insurance industry. Congress may have overcompensated in addressing a perceived disadvantage faced by the stock life insurance industry relative to the mutual life insurance industry. This court is not the appropriate forum to resolve such concerns, however.

■ Similarly, we note the unique tactical advantage assumed by the IRS in promulgating regulations that address arguments that it has lost in litigation. This practice may seem unfair to taxpayer litigants. But we cannot address such policy concerns, which "are more properly addressed to legislators or administrators, not judges." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 864, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984) (footnote omitted).

### CONCLUSION

Treasury Regulation § 1.809–9 provides that neither the differential earnings rate under § 809(c) nor the recomputed differential rate used to compute the recomputed differential earnings amount under § 809(f)(3) may be less than zero. This regulation is neither unreasonable nor inconsistent with the statute. As such, plaintiff is not entitled to a refund.

Plaintiff's motion for summary judgment is DENIED. Defendant's motion for summary judgment is GRANTED. No costs.