**JOHN HANCOCK FINANCIAL SERVICES, INC., and John Hancock Life Insurance Company (formerly John Hancock Mutual Life Insurance Company), Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5163.

United States Court of Appeals,
Federal Circuit.

DECIDED: Aug. 9, 2004.

---

Theodore R. Groom, Groom Law Group, Chartered, of Washington, DC, argued for plaintiffs-appellants. On the brief was Matthew J. Zinn, Steptoe & Johnson LLP, of Washington, DC. Of counsel was J. Walker Johnson.

David I. Pincus, Attorney, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Ei-

---

leen J. O'Connor, Assistant Attorney General and Robert W. Metzler, Attorney.

Before MAYER, Chief Judge, BRYSON, and LINN, Circuit Judges.

BRYSON, Circuit Judge.

John Hancock Financial Services, Inc., and John Hancock Life Insurance Company (collectively, "Hancock") appeal from the decision of the United States Court of Federal Claims denying a claim for a tax refund. Hancock invoked the "tax benefit rule" in an effort to obtain, for certain years, tax benefits that it was unable to use in earlier years. In a thorough opinion, the trial judge held that the tax benefit rule did not apply in the context of this case. *John Hancock Fin. Servs., Inc. v. United States*, 57 Fed.Cl. 643 (Fed.Cl. 2003). We agree that the tax benefit rule is inapplicable in this case, and we therefore affirm.

## I

Stock life insurance companies are owned by shareholders, who receive shareholder dividends based on company earnings. Stock companies also make payments known as policyholder dividends to their policyholders. Policyholder dividends are price rebates that the company can deduct from its taxable earnings. Shareholder dividends, on the other hand, constitute a disbursement of the company's earnings and may not be deducted.

Unlike stock companies, mutual life insurance companies are owned by their policyholders. They pay "policyholder dividends" to their policyholders, but because mutual companies have no separate group of shareholders, the policyholder dividends do not distinguish between price rebates and distributions of earnings. If mutual companies were allowed to deduct the entire amount of their policyholder dividends, they would have a potential tax advantage over stock companies because they would

be allowed to deduct the component of their policyholder dividends constituting distributions of earnings, which for stock companies would be non-deductible.

In the early 1980s Congress sought to solve the problem of the differing tax treatment of stock and mutual companies by enacting legislation that permitted mutual companies to deduct only a portion of their policyholder dividends. Deficit Reduction Act of 1984, Pub. L. No. 98–369, 98 Stat. 494, 733 (codified at 26 U.S.C. § 809 (Supp. II 1984)). The statute created a complex formula for calculating the portion of the policyholder dividends that a mutual company could deduct. That statute was in effect during all of the transactions at issue in this case, although it has recently been repealed. Pension Funding Equity Act of 2004, Pub. L. No. 08–218, § 205, 110 Stat. 596, 610 (2004).

The statutory scheme for calculating the deduction for mutual companies in the affected years works as follows: First, the "current stock earnings rate" is calculated. The current stock earnings rate is derived by averaging the earnings rates of 50 major domestic stock life insurance companies for the previous three years. The current stock earnings rate is calculated after payment of the policyholder dividends but before payment of the shareholder dividends. Next, the "average mutual earnings rate" is calculated. The average mutual earnings rate is based on the aggregate gain or loss from operations for all domestic mutual life insurance companies divided by their aggregate equity bases for a particular year. That rate is determined after the payment of policyholder dividends.

The statute next provides for the calculation of an "imputed earnings rate." That rate is set by statute at 16.5 percent in the case of taxable years beginning in 1984. For later years, it is the amount that bears the same ratio to 16.5 percent as the cur-

rent stock earnings rate bears to the base period stock earnings rate (i.e., the average of the stock earnings rates calculated for calendar years 1981, 1982, and 1983). Because the average of the stock earnings rates for 1981 through 1983 was 18.221 percent, the imputed earnings rate is always equal to 90.55 percent of the current stock earnings rate.

The next step is to determine an initial "differential earnings rate," or DER, which is the excess of the imputed earnings rate for the taxable year over the average mutual earnings rate for the second calendar year preceding the calendar year in which the taxable year begins. In the event that the average mutual earnings rate exceeds the imputed earnings rate, the DER is treated as zero. *See CUNA Mut. Life Ins. Co. v. United States*, 169 F.3d 737, 742 (Fed.Cir.1999).

The initial DER is then multiplied by the equity of the particular mutual company taxpayer. The resulting amount is subtracted from the deduction the mutual company is allowed to take based on its policyholder dividends.

Once the actual earnings rate of the mutual companies is known, which usually happens in the following year, a recomputed DER is calculated. This recomputed DER is then compared to the initial DER and the mutual companies are required to adjust their earnings for the subsequent year based on the relationship between the two amounts. If the recomputed DER is greater than the initial DER, the mutual companies are required to make an upward adjustment in their income for the subsequent year. If the recomputed DER is less than the initial DER, the mutual companies are permitted to reduce their income for the subsequent year by a corresponding amount. Thus, the recomputed DER ultimately determines the amount by which the policyholder deduction is reduced for a given year.

In 1986, the actual average mutual earnings rate exceeded the imputed earnings rate, due in part to the fact that the imputed earnings rate is calculated based on a three-year average of the stock earnings rate while the average mutual earnings rate is based on the average mutual earnings for a single year. Several mutual companies sought to increase the amount of their policyholder deductions for taxable year 1987 based on the excess of the average mutual earnings rate over the imputed earnings rate. The courts, including this court, unanimously rejected that effort. The courts ruled that the statute did not permit mutual companies to take a policyholder dividend deduction greater than the amount of the policyholder dividends they actually paid, even if the average mutual earnings rate was greater than the imputed earnings rate in a particular year. Thus, the courts declined the mutual companies' invitation to construe the statute as recognizing a "negative excess" of the imputed earnings rate over the average mutual earnings rate that would generate an increase, rather than a reduction, in the policyholder dividend deduction. *CUNA*, 169 F.3d at 742; *Indianapolis Life Ins. Co. v. United States*, 115 F.3d 430 (7th Cir.1997); *Am. Mut. Life Ins. Co. v. United States*, 43 F.3d 1172 (8th Cir.1994).

Following the court decisions rejecting the mutual companies' "negative excess" argument, Hancock conceded its 1987 claim. However, it then filed refund claims for 1988 and 1989. In those claims, Hancock asserted that, based on the excess of the actual average mutual earnings rate over the imputed earnings rate for 1986 (the recomputed DER), it should be permitted a corresponding decrease in the amount of the reduction in its policyholder dividend deduction required by section 809 in 1988 and 1989. Hancock's theory was that because it had been denied the use of the negative recomputed DER for 1986 in

its 1987 tax calculations, it had a deduction for 1987 that generated no tax benefit in that year. Accordingly, Hancock claimed, the tax benefit rule gave it the right to take advantage of that deduction in 1988 and 1989, when the recomputed DER was calculated for 1987 and 1988. Hancock did not seek to reduce its 1990 income based on the recomputed DER for 1989, because the actual mutual earnings rate again exceeded the imputed earnings rate for that year.

After the Internal Revenue Service denied Hancock's refund claim, Hancock filed this action in the Court of Federal Claims. Hancock again contended that even though the policyholder deduction for 1987 could not be increased based on the negative excess of the recomputed DER, the company should nonetheless be permitted to obtain a tax benefit in the later years based on that negative excess. The Court of Federal Claims rejected that argument, and Hancock appealed.

## II

The federal income tax system relies on a system of annual accounting in which income is segregated into units of one year in length. While annual accounting is convenient, it does not necessarily recognize transactions that remain open at the end of a year or that are reopened in a subsequent year. The tax benefit rule is a judicially created doctrine that has its roots in a statutory provision and is designed to "approximate the results produced by a tax system based on transactional rather than annual accounting." *Hillsboro Nat'l Bank v. Comm'r*, 460 U.S. 370, 381, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983); 26 U.S.C. § 111.

Under the exclusionary aspect of the tax benefit rule, a taxpayer may exclude from income amounts attributable to the recovery during a taxable year of an amount deducted in a prior taxable year to the extent that the deduction did not result in a tax benefit for the taxpayer. 26 U.S.C. § 111(a). The tax benefit rule applies, for example, when a taxpayer claims the write-off of a bad debt as a deduction but is unable to obtain a tax benefit from the deduction that year. In the event the taxpayer manages to collect on the debt in a subsequent year, the taxpayer is not required to treat that payment as income because the taxpayer did not receive the benefit of the deduction in the year the deduction was taken. *See Allstate Ins. Co. v. United States*, 936 F.2d 1271, 1273–74 (Fed.Cir.1991).

The converse is also true. If a previously deducted loss was claimed as a tax deduction and that deduction generated a tax benefit, the taxpayer must include any amounts recovered from that loss as income in the event that the loss is recovered in a subsequent year. *See Hillsboro*, 460 U.S. at 381–82, 103 S.Ct. 1134. Thus, in the above example if the taxpayer had received the benefit of its deduction in the year that it wrote off the debt, it would be required to count any recovery on that debt as income in the year that it received it.

This court's decision in *Allstate* established three requirements that must be met before a taxpayer may take advantage of the exclusionary aspect of the tax benefit rule. First, there must be a loss that was deducted but did not result in a tax benefit. 936 F.2d at 1274. Second, there must be a later recovery on the loss. *Id.* Third, there must be a nexus between the loss and the recovery. *Id.* at 1275–76.

Hancock's theory before the Court of Federal Claims was that the tax benefit rule should apply to reduce its income for 1988 and 1989, the years the recomputed DERs were calculated for 1987 and 1988, based on the excess of the mutual earnings rate for 1986 over the imputed earnings

rate for that year. The Court of Federal Claims disagreed with Hancock and held that the tax benefit rule did not apply because Hancock had already received the benefit of the maximum deduction allowed by law and because there was no recovery related to any loss Hancock had experienced.

## A

On appeal, Hancock first contends that the Court of Federal Claims erred in rejecting Hancock's argument that it had incurred a deductible loss for which it did not enjoy a corresponding tax benefit. Hancock argues that the excess of the mutual earnings rate over the stock earnings rate in 1986 entitled it to a "deduction" in 1987 but that it was unable to receive the benefit of that deduction in that year.

The Court of Federal Claims rejected Hancock's argument on the ground that the excess of the average mutual earnings rate over the imputed earnings rate in 1986 gave rise to no deduction and therefore did not give Hancock any rights under the tax benefit rule. The trial court noted that in light of this court's decision in *CUNA*, mutual companies were not permitted to use any excess of the mutual company earnings rate over the imputed earnings rate to increase their policyholder deductions. Because Hancock was not entitled to a deduction attributable to that excess in the first place, the trial court concluded that the tax benefit rule did not apply.

Hancock argues that the court erred because "[t]he tax benefit rule does not apply only to conventional 'deductions' that are subtracted in the calculations of taxable income." For purposes of the tax benefit rule, Hancock contends, "any amounts that have the effect of reducing income tax liability of any taxable entity" must be considered to be a "deduction."

Because the relationship of the mutual earnings rate to the stock earnings rate has the effect of reducing income tax liability of a taxable entity, according to Hancock, it must be considered to generate a deduction for purposes of the tax benefit rule.

The statute that codified the tax benefit rule, 26 U.S.C. § 111, provides that the rule applies to "any amount deducted in any prior taxable year." In other words, in order for an amount to be excluded from gross income, it must have previously been claimable as a deduction. In *American Mutual Life Insurance Co. v. United States*, 267 F.3d 1344 (Fed.Cir.2001), this court held that the tax benefit rule is not applicable when a taxpayer receives the full allowable benefit from a deduction, even if the allowable deduction is not equal to the taxpayer's loss. In that case we noted that American Mutual had already taken the full dollar amount of the tax deduction available for reserves under the then-applicable statute. *Id.* at 1351. Accordingly, we held that American Mutual was not entitled to invoke the tax benefit rule to reduce its gross income in a later year by an amount equal to the undeducted loss from the earlier year.

If the tax benefit rule does not apply when a taxpayer has taken the full dollar amount available as a deduction but has not received a dollar-for-dollar benefit from the deduction, it certainly cannot apply when the taxpayer is not legally entitled to take any deduction at all. A statutory limitation on the amount of a deduction that may be taken constitutes a legislative judgment that there should be no tax benefit from any excess beyond the deductible amount, either in the initial year or in any other year.

As we have noted, a reduction of the amount by which the imputed earnings rate exceeds the average mutual earnings

rate operates to reduce a mutual company's taxable income by reducing the statutorily mandated decrease in its allowable policyholder dividend deduction. That does not mean, however, that a mutual company's taxable income is reduced by the amount of any excess of the average mutual earnings rate over the imputed earnings rate. As we held in *CUNA*, any excess of the average mutual earnings rate over the imputed earnings rate does not increase the policyholder dividend deduction and therefore does not reduce the taxpayer's income. 169 F.3d at 737–38, 742. Because section 809 did not provide for any deduction due to the excess of the average mutual earnings rate over the imputed earnings rate for 1986, we reject Hancock's argument that it is entitled to invoke the tax benefit rule to obtain the benefits of the purported deduction in later taxable years.

### B

Even assuming that a valid deduction existed in 1986 for which Hancock received no tax benefit, there was no related recovery on that loss. While a reduction in the allowable amount of a deduction ordinarily constitutes income, in this case there is not a sufficient nexus between any such income and Hancock's 1986 deduction to satisfy the requirements of the tax benefit rule.

■ In light of the purpose of the tax benefit rule to create transactional equity across multiple tax years, income received in subsequent years must be part of the same transaction that resulted in the deduction in the earlier year. That requirement was clearly stated by this court in *Allstate*, where we held that "[w]hile the tax benefit rule applies to subrogation, the taxpayer must show a direct link between the loss (deducted without a tax benefit) and the later recovery." 936 F.2d at 1276. In that case Allstate was able to demonstrate the existence of a nexus between the individual losses it sustained in 1969 and the subrogation recoveries it received in 1971. Because Allstate had deducted its losses in 1969, but had not received a tax benefit for its losses in that year, it was permitted to exclude the 1971 recoveries from its income.

There is no similar nexus in the present case. The "recovery" that Hancock points to is the excess of the imputed earnings rate over the actual average mutual earnings rate for 1987 and 1988. Hancock argues that the excess in those years constitutes income that is related to the negative 1986 recomputed differential earnings amount or the 1986 mutual earnings rate. The problem is that there is no connection between the 1986 rates and the imputed earnings rates for 1987 and 1988.

Hancock's response is to argue that there must be a connection because such a nexus was presumed by Congress. Hancock argues that this is "because Congress based the entire differential earnings rate concept upon a comparison between stock and mutual earnings rates." Simply because both the stock and mutual earnings rates are factored into the calculation of the DER does not, however, mean that the imputed earnings rate for a subsequent year is necessarily related to the DER for a previous year. There must be a transactional nexus between the subsequent income and the prior deduction that goes beyond the fact that both are governed by the same statutory provision. Thus, the taxpayer must establish that the subsequent recovery and prior deductions are all part of a single multi-year transaction, rather than simply part of the same statutory scheme.

Arguing that there is a nexus because Congress based a particular tax concept on a comparison between two rates is no different from suggesting that all income for

**1308**

one year can somehow be considered "related" to all losses for the previous year. If that were the case, there would be no need for the relatedness aspect of the tax benefit rule because all income in later years would be presumed to be related to any losses incurred in prior years. Such a rule would be contrary to our ruling in *Allstate* that in order to meet the nexus requirement of the tax benefit rule a taxpayer must establish that the subsequent recovery was related to the same transaction as the deduction for which the taxpayer did not receive a tax benefit for in a prior year. *See Allstate*, 936 F.2d at 1275–76. In sum, because Hancock has failed to establish either that it was entitled to a deduction in 1986 or that there was any transactional nexus between the putative deduction from 1986 and the income it received for 1987 and 1988, it is not entitled to relief under the tax benefit rule.

*AFFIRMED.*