Velia **FLYING HORSE, et al.,** Plaintiffs,

v.

The **UNITED STATES,** Defendant.

No. 99–858C.

United States Court of Federal Claims.

May 17, 2001.

Kent M. Morrow, Bismarck, North Dakota, attorney of record for plaintiffs.

Kent G. Huntington, Washington, D.C., with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant.

## OPINION ON DEFENDANT'S MOTION TO DISMISS

REGINALD W. GIBSON, Senior Judge.

### INTRODUCTION

Plaintiffs are Native–Americans formerly employed in various positions at a tribal school located on an Indian reservation in North and South Dakota. The instant single-count amended joint complaint for money damages was filed by plaintiffs on November 30, 1999, under the Contract Disputes Act of 1978 ("the CDA" or "the Act"), against the United States through the Bureau of Indian Affairs ("the BIA" or "defendant"), alleging breach of their individual written contracts of employment with the BIA. The alleged breach occurred when plaintiffs' contracts

were canceled by the tribal school board in May 1999 and their positions thereafter filled by other individuals. Defendant filed a motion to dismiss the amended complaint on April 5, 2000, pursuant to Rule 12(b)(1) of the rules of this court ("RCFC"), for lack of subject matter jurisdiction, arguing the following three separate grounds: 1) plaintiffs were employees of the federal government and, therefore, not independent contractors 'procured for services' with the United States as contemplated under the CDA scheme; 2) plaintiffs did not comply with the jurisdictional prerequisites of the CDA; and 3) plaintiffs have failed to exhaust their administrative remedies prior to filing suit in this court.

Plaintiffs counter that the plain language of the CDA and its legislative history establish that their contracts are covered by the Act. For the reasons stated herein, the court agrees with plaintiffs and concludes that under a plain reading of the CDA, their contracts are, indeed, within both the text and the spirit of the Act. Accordingly, the court holds herein that it has subject matter jurisdiction over plaintiffs' claims.

### FACTS AND PROCEDURAL HISTORY

Plaintiffs Velia Flying Horse, Michael Tally, Arbutus Steele, Mavis Mutchler, Joseph Two Bears, Mildred Thomas, Marie Brown, and Wilma Red Bear (hereinafter "plaintiffs") are all residents of the Standing Rock Indian Reservation ("the reservation") located in both the states of North and South Dakota. Pursuant to separate individual contracts of employment, entered into in May 1999, between plaintiffs and the Office of Indian Education Programs ("OIEP") administered by the BIA of the Department of the Interior ("the DOI"), plaintiffs were contracted by the Rock Creek Day School ("the school") for the period August 23, 1999 to May 26, 2000. The school is located on the reservation and serves the people of the Standing Rock Sioux Nation ("the Tribe").

The BIA is an agency of the United States, established by Congress in 1834, providing services to Native–Americans on Indian reservations, including but not limited to educational services pursuant to the U.S. Constitution and statutes promulgated under Title 25 of the United States Code. U.S. CONST. art. I, § 8; 25 U.S.C. § 2. According to its mission statement, the purpose of the BIA is to: "enhance the quality of life, to promote economic opportunity, and to carry out the responsibility to protect and improve the trust assets of American Indians, Indian tribes and Alaska Natives.... accomplish[ing] this through the delivery of quality services, [and] maintaining government-to-government relationships within the spirit of Indian self-determination." *Available at* http://www.doi.gov/bia/mission.html. The historical nature of the relationship between the BIA and Native–American tribes in this nation has been not only longstanding but, for the most part, chaotic.

Plaintiffs were hired by the BIA as 'educators' for the school in May 1999, including positions as schoolteachers, a bus driver, and a cook. The Bureau of Indian Affairs Manual ("BIAM") is an internal agency manual, largely codified in 25 C.F.R. pt. 38 pursuant to 25 U.S.C. § 2012, which gives guidance and lists procedures for the BIA in administering the agency's education programs, such as the one at the Standing Rock Reservation. Under the BIAM, an educator is described as—

> an individual whose services are required, or who is employed, in an education position * * * [defined as having] ... the duties and responsibilities of which: (1) involve instruction, supervision, student services, student care, facilities maintenance and operations and/or administrative activities at a school....

62 BIAM 11.30–P. Accordingly, each of the plaintiffs' contracts of employment for services identified them as educators, as defined by the BIAM and the enabling statute, including those in non-teaching positions.

Pursuant to the Tribally Controlled Schools Act of 1988, the Tribe, with the permission of the BIA, transformed the school by a May 1999 resolution, from a BIA run and operated school to a grant school. 25 U.S.C. § 2502. Under the unique statutory scheme set up by Congress for the educational needs of Native–Americans by this statute, Native–American tribes are allowed,

by request for permission from the BIA, to operate and control their own schools with funds provided by the BIA, as opposed to the BIA and OIEP operating the schools through bureaucratic means. *Id.* Congress' intent on allowing such was to:

> [D]eclare its commitment to the maintenance of the Federal Government's unique and continuing trust relationship with and responsibility to the Indian people through the establishment of a meaningful Indian self-determination policy for education which will deter further perpetuation of Federal bureaucratic domination of programs.... [A] major national goal of the United States is to provide the resources, processes, and structures which will enable tribes and local communities to effect the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure for self-determination essential to their social and economic well-being.... [T]hese [goals] may best be met through a grant process.

*Id.*

Shortly after the Tribe took over operation of the school in May 1999, pursuant to the powers given it under the above-mentioned statute, it terminated plaintiffs and hired other individuals to fill their positions. Why plaintiffs were replaced and whether the new employees were also Native–Americans, which, under BIA rules, must receive an employment preference, is not apparent from the parties' filings in this court. Such a determination, however, is not relevant to our decision regarding plaintiffs' claims under the CDA.

Pursuant to 62 BIAM 11, the BIA was required to issue Reduction In Force ("RIF") notices informing plaintiffs that their contracts were canceled. Said notices were to outline the procedures plaintiffs would be entitled to if they chose to grieve their separations from employment. Defendant avers that such notices were sent to plaintiffs on June 21, 1999, and then supplemented with additional correspondence through August 10, 1999, each of which explained plaintiffs' various rights under the contracts. Accord-

ing to defendant, plaintiffs' rights, as outlined in the RIF notices, included the right to file an appeal of their separations with the OIEP, a right, it claims, plaintiffs failed to exercise. Plaintiffs, on the other hand, claim that most of them did not receive said RIF notices informing them that their contracts were terminated.

The individual express contracts of employment that are in issue are one-page written and dated documents on identical BIA forms, which were signed by each plaintiff and the OIEP representative, who, apparently, has authority to bind the BIA in contract. Defendant has effectively conceded that each of plaintiffs' express written contracts are both valid and binding on the government. The contracts of employment each state, *inter alia,* that "[t]his contract may be terminated or amended by the school prior to its expiration date in accordance with the rules and regulations of the Office of Indian Education Programs as set forth in 62 BIAM 11." Amend. Compl. (attachments). In their amended complaint, plaintiffs allege that defendant did not follow these rules and regulations under 62 BIAM 11 in terminating their contracts.

As a result of the foregoing, on June 28, 1999, plaintiffs, through their counsel, forwarded a Notice of Claims letter, pursuant to the Contract Disputes Act of 1978 ("CDA"), to Richard Zephier, contracting officer for the BIA at the Great Plains Regional Office ("GPRO") in Aberdeen, South Dakota. 41 U.S.C. §§ 601–13. By this letter, plaintiffs aver to have filed their individual breach of contract claims with the contracting officer of the BIA. According to plaintiffs, Mr. Zephier failed to render a decision within sixty (60) days, and that such failure constitutes a denial of plaintiffs' claim under the CDA. *Id.* at §§ 605(c)(2), (5) ("A contracting officer shall, within sixty days of receipt of a submitted certified claim ... (A) issue a decision; or (B) notify the contractor of the time within which a decision will be issued.... Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision ... denying the claim"). Accordingly, plaintiffs allege that they have fulfilled the prerequi-

sites of the CDA necessary for jurisdiction in this court for claims under the Act.

On the other hand, defendant alleges, by affidavit, that the contracting officer did not timely receive said notice and that, moreover, Mr. Zephier does "not administer employment contracts, either for the GPRO or for BIA education personnel at the Agencies, including the Standing Rock Agency, and thus that this office [GPRO] has no involvement in funding, administering, auditing or carrying out routine contracting activities with respect to BIA education personnel contracts." Def.'s Reply Supp. Mot. to Dis., Affid. of Richard Zephier, May 5, 2000. Furthermore, defendant alleges that the notice of claim sent by plaintiffs did not contain either a claim for a sum certain or the necessary certifications, all of which are required for jurisdiction under the CDA. *Id.* at § 605(c)(1) ("For claims of more than $100,000, the contractor shall certify that the claim [for a sum certain] is made in good faith, that the supporting data is accurate and complete to the best of his knowledge and belief, [and] that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable ....").

Plaintiffs initially filed this action on October 5, 1999, and then amended their complaint on November 30, 1999, excising two of the originally-named plaintiffs from the first complaint. In the amended one-count joint complaint, plaintiffs request equitable relief as the court deems proper and damages amounting to plaintiffs' salaries and benefits under the contracts, with interest. After a review of the instant contract claims, the court has determined that monetary damages, if granted, would collectively exceed $256,320, plus interest. *See id.* at § 611 ("Interest on amounts found due contractors on claims shall be paid to the contractor ... at the rate established by the Secretary of the Treasury ....").

Plaintiffs assert jurisdiction in this court over their claims based on the CDA and their contracts of employment, discussed above, which were between themselves and the United States, through the BIA. *Id.* at § 602(a)(2). In other words, plaintiffs allege that they are 'contractors,' who were 'procured for services' as contemplated under the CDA scheme, and not federal employees, as defendant alleges. *Id., see infra* at 423–24. Additionally, ·in their amended complaint, plaintiffs state that they "have been willing and able to perform all duties under the contracts.... [and] Defendant has refused to permit Plaintiffs to perform...." Amend. Compl. at 2.

On April 5, 2000, in lieu of filing an answer pursuant to RCFC 12(b), defendant filed a motion to dismiss plaintiffs' complaint for lack of subject matter jurisdiction. Defendant bases its motion on three (3) grounds, to wit 1) plaintiffs are not contractors 'procured' by the BIA as envisioned by the CDA, but federal employees, and, therefore, their contracts of employment are not covered by the CDA, *id.* at § 602(a)(2); 2) even if plaintiffs' contracts are covered by the CDA, plaintiffs have failed to meet the jurisdictional prerequisites under the CDA in order to file suit in this court, *id.* at § 605; and 3) plaintiffs have failed to exhaust the available administrative remedies and that the Civil Service Reform Act ("CSRA"), *see generally* 5 U.S.C. §§ 1101–05, 1201–22, 2301–05, 7501–14, & 7701–03, and other statutory provisions provide plaintiffs with their sole course of redress for these alleged claims.

Plaintiffs responded to defendant's motion on May 2, 2000, and defendant replied to said response on May 17, 2000. Upon reviewing the aforementioned filings, the court is of the opinion that plaintiffs have valid and effectual contracts with defendant which are covered under the CDA scheme. 41 U.S.C. § 602(a)(2). Therefore, for the reasons stated below, we deny defendant's motion to dismiss for lack of subject matter jurisdiction.

## DISCUSSION

### I.

#### A. *Introduction*

Jurisdiction over the subject matter in this case is initially conferred on this court by the Tucker Act, which requires that a plaintiff claim an independent substantive right en-

forceable against the United States. 28 U.S.C. § 1491. It does not, however, by itself "create any substantive right enforceable against the United States for money damages." *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), *quoting United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). As such, to launch a viable claim in this court under the Tucker Act's granting of jurisdiction, a plaintiff must find an express waiver of sovereign immunity by the government, which "cannot be implied but must be unequivocally expressed." *Saraco v. United States*, 61 F.3d 863, 864 (Fed.Cir.1995), *quoting United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

The Tucker Act states, in relevant part, as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress ... or upon *any express or implied contract with the United States ....*

28 U.S.C. § 1491(a)(1) (emphasis added).

Therefore, "[f]or a plaintiff's claim to be jurisdictionally sound, there must exist a statute, regulation, or contract, distinct from the Tucker Act itself, that specifically allows the monetary relief plaintiff requests." *Son Broadcasting, Inc. v. United States*, 42 Fed. Cl. 532, 535 (1998). Thus, in this instant case, the waiver of sovereign immunity, and the substantive actionable right plaintiffs would have in this court, initially comes from the Tucker Act's clause, as stated above, and the substantive provisions of the contracts of employment between plaintiffs and the BIA.

Plaintiffs, however, filed this action under the Contract Disputes Act and, thereby, seek to invoke jurisdiction here under said statute. Congress enacted the CDA "[i]n order to provide a comprehensive uniform statutory scheme for judicial and administrative resolution of government contract claims...." *Ervin & Associates, Inc. v. United States*, 44 Fed.Cl. 646, 653 (1999). As to the type of contracts it covers, the CDA states the following:

§ 602. **Applicability of law**

(a) **Executive agency contracts**

Unless otherwise specifically provided herein, this chapter applies to *any express or implied contract* ... entered into by an executive agency [like the BIA] for—

(1) the procurement of property, other than real property in being;

(2) *the procurement of services;*

(3) the procurement of construction, alteration, repair or maintenance of real property; or,

(4) the disposal of personal property.

41 U.S.C. § 602(a) (1978) (emphasis added).

A determination of whether a contract is covered by any of the provisions of the CDA, quoted above, thereby allowing this court jurisdiction over a claim, is a question of law. *Case, Inc. v. United States*, 88 F.3d 1004, 1008 (Fed.Cir.1996). The following section explains the standards the court must implement in answering this question and thus ruling on defendant's motion to dismiss.

B. *Defendant's Motion to Dismiss—Subject Matter Jurisdiction Under Rule 12(b)(1)*

When evaluating a Rule 12(b)(1) motion to dismiss, such as the one at bar, the court must construe the allegations of the complaint favorably to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (abrogated on other grounds). Evaluating the complaint in this manner is required regardless of whether the motion to dismiss is one for failure to state a claim or for lack of subject matter jurisdiction. *Id.* Thus, in rendering our decision, the court will presume that all of plaintiffs' factual allegations are true, including that they had signed valid contracts for the provision of educational services with the BIA. *Forestry Surveys and Data v. United States*, 44 Fed.Cl. 485, 490 (1999).

If the motion to dismiss for lack of subject matter jurisdiction challenges the truth of the jurisdictional *facts* in the complaint, the court may look beyond the pleadings to consider all available evidence—in the instant case, the parties' filings—in order to determine jurisdiction. *Rocovich v. United States*,

933 F.2d 991, 993 (Fed.Cir.1991). Similarly, if the court has doubts regarding jurisdiction, it may look at all the evidence presented to satisfy itself regarding the jurisdictional facts. *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1462 (Fed.Cir.1998). Indeed, the court may, and often must, find facts on its own.

Subject matter jurisdiction may be challenged at any time by the parties, the court *sua sponte,* and, of course, on appeal. *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir. 1993). Plaintiffs here, no doubt, bear the burden of establishing subject matter jurisdiction and must do so by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir.1988). Accordingly, mindful of plaintiffs' burden to establish the jurisdiction of this court, as well as our own duty to ensure the legitimacy of our jurisdiction, we consider all the evidence presented in evaluating the government's motion to dismiss, even evidentiary matters outside of the pleadings. *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985). Indeed, if a defendant challenges jurisdiction, a plaintiff cannot rely merely on allegations in the complaint but must instead bring forth relevant, competent proof to establish jurisdiction. *Reynolds,* 846 F.2d at 747.

It is important to understand, however, that the court's task on this issue is not to decide "whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. This is so even if the pleadings facially show that "recovery is very remote and unlikely." *Id.* Accordingly, the court will implement the foregoing standards by addressing defendant's three arguments, under Rule 12(b)(1), that: (A) plaintiffs were federal employees whose contracts of employment are not covered by the CDA; (B) even if plaintiffs' contracts are covered by the CDA, plaintiffs have failed to satisfy the jurisdictional prerequisites under the Act; and (C) plaintiffs have failed to exhaust their available administrative remedies, thereby obviating jurisdiction in this court. We will analyze each separately dispositive issue seriatim.

## II.

### A. *Plaintiffs' Contracts of Employment Are Covered Under the CDA Scheme*

Defendant's first argument is that plaintiffs were federal employees, who are not covered by the CDA regardless of their contractual relationship, rather than independent contractors who were 'procured' by the government for 'services' under the CDA scheme. 41 U.S.C. § 602(a), *see supra* at 423–24. Plaintiffs allege, in their amended complaint, that under a plain reading of the CDA, they were 'contractors' who were 'procured for services' by the BIA because they signed individual authorized contracts of employment with the agency. Accordingly, the sole question before us on this point is whether plaintiffs' contracts are the type of contracts covered by the CDA. The court notes that at the time of this opinion there is no binding case law directly on point regarding this issue.

We begin our analysis with the "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). The relevant language of the CDA which indicates the type of contracts it covers states: "[u]nless otherwise provided herein, this chapter applies to *any express or implied contract* . . . entered into by an executive agency [with a contractor] for . . . *the procurement of services* . . . ." 41 U.S.C. § 602(a) (emphasis added); *see supra* at 424. We now analyze each element of the foregoing.

First, regarding the phrase 'unless otherwise provided herein,' there are no provisions contained in the CDA which either specifically or impliedly exclude plaintiffs' contracts from its ambit. Second, regarding the phrase 'entered into by an executive agency,' the BIA, as stated earlier, is a federal executive agency, a point which neither party contests. Third, a 'contractor' is defined by the

CDA as "a party to a Government contract other than the government." *Id.* at § 601(4). This definition is "broad and all-encompassing," as plaintiffs assert, and, thus, the court has absolutely no reason to doubt that plaintiffs fit this definition under the CDA scheme.

Next, the CDA states that it covers "*any* express or implied contract" for the procurement of services. *Id.* at § 602(a) (emphasis added). Congress' use of the term *any* is indicative of its desire that the Act have broad and inclusive coverage. The contracts in issue are dated and signed by each plaintiff and an OIEP representative, who, apparently, has authority to sign contracts of employment on behalf of the BIA. Moreover, defendant has effectively conceded that the contracts in issue are valid, effectual, and binding on the government. Indeed, defendant has not raised a single argument that the contracts are invalid for any reason and it refers to them throughout its pleadings as 'contracts,' not 'alleged contracts.' Consequently, plaintiffs have clearly met the element of 'any express or implied contract.'

■ Finally, the contracts in issue were for 'the procurement of services,' as plaintiffs allege. In arriving at this conclusion, the court "begin[s] by examining the language [of the Act] to determine the plain meaning of the words used by Congress." *Bazalo v. West,* 150 F.3d 1380, 1382 (Fed.Cir.1998). Moreover, the court will not "disregard the plain meaning of an ordinary word for a technical one ... [unless there is] some indication in the statute that Congress intended to use the word in that technical sense." *CUNA Mutual Life Ins. Co. v. United States,* 169 F.3d 737, 740 (Fed.Cir.1999). As the CDA does not define either the word 'procurement' or 'services' in the Act's definition section, or anywhere else for that matter, the court will give each word its plain and ordinary meaning.

■ The word 'procurement' as used in § 602(a)(2) is a noun which demonstrates, by definition, that something was obtained or acquired. WEBSTER'S II NEW COLLEGE DICTIONARY 882 (1995). In other words, to 'procure' something simply means to obtain or acquire it. *Id.* Accordingly, it is obvious that the BIA obtained or acquired plaintiffs' services to be performed at the school. As for the term 'services,' the applicable definition in the dictionary is: "[e]mployment in duties or work for another, esp. for a government." *Id.* at 1010. Plaintiffs here easily fit this definition as they were obviously contracted to perform services at the school, which included teaching, maintenance, and transportation services.

Buttressing this point is the definition of the term 'educator' contained in the BIAM, which, as stated earlier, is the term used to describe plaintiffs' positions. It defines each plaintiff as "an individual *whose services are required,* or who is employed, in an education position." 25 U.S.C. § 2012(n)(1)(A)(ii); 62 BIAM 11.3P (emphasis added). The reference to the term 'services' clearly indicates that, at the very least, plaintiffs were hired by the BIA to provide their various educational and support *services* for the school as that term is understood. Furthermore, this language, which contains the disjunctive 'or,' also indicates that the drafters of the BIAM intended for the BIA to have discretion to hire educators under both employment and procurement scenarios. Defendant's bare assertion that plaintiffs were 'employees' who are not covered under the CDA, without any reference to a single provision of the CDA indicating such, is unpersuasive. Accordingly, the court concludes that under a plain reading of the CDA, and considering the pleadings in the most favorable light to plaintiffs as it must, *supra* at 424, plaintiffs were *procured* by the BIA for their *services* under the CDA scheme.

The legislative history of the CDA, which plaintiffs cite, supports this conclusion. "[T]he provisions of the [CDA] bill [are] applicable to *all* express or implied contracts entered into by an executive agency of the United States ... for the procurement of ... services .... The bill would have *broad application* in order to unify the diverse and often inconsistent procedures presently existing among the many procuring agencies ...." 41 U.S.C.A. § 602(a) (1978) (emphasis added). These statements contained in the legislative history notes of the CDA indicate

Congress' intent that the CDA be a broad statute, covering a multitude of government contract scenarios, including the type of contracts of employment between plaintiffs and the BIA.

Defendant's position that plaintiffs were federal employees who, despite having valid contracts, were not 'contractors' and, thus, are unable to file breach claims under the CDA is illogical. Accordingly, when the court evaluates the pleadings in the most favorable light to plaintiffs, we are constrained to hold that, considering the plain language of the CDA, the validity of plaintiffs' contracts, and the legislative history of the Act indicating Congress' intent that it have broad coverage, said contracts are within the ambit of the CDA.

**B.** *Plaintiffs Have Fulfilled the Jurisdictional Prerequisites of the CDA*

Defendant argues that plaintiffs have failed to satisfy the jurisdictional prerequisites of the CDA and, therefore, the court does not have jurisdiction to entertain their claims. Plaintiffs, of course, aver that they have fully complied. The relevant controlling portions of the CDA on this issue state as follows:

**§ 605. Decision by contracting officer**

**(a) Contractor claims**

All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. . . .

\*     \*     \*     \*     \*     \*

**(c) Amount of claim; certification; notification; time of issuance; presumption; authorization of certifier**

(1) A contracting officer shall issue a decision on any submitted claim of $100,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. For claims of more than $100,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which

the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

(2) A contracting officer shall, within sixty days of receipt of a submitted certified claim over $100,000—

    (A) issue a decision; or

    (B) notify the contractor of the time within which a decision will be issued.

\*     \*     \*     \*     \*     \*

(5) Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided for in this chapter. . . .

\*     \*     \*     \*     \*     \*

(7) The certification required by paragraph (1) may be executed by any person duly authorized to bind the contractor with respect to the claim.

41 U.S.C. § 605.

To summarize, § 605 above requires that a contractor fulfill the following: 1) file a written claim; 2) for an amount certain; 3) with the contracting officer; 4) for a decision within sixty (60) days; and 5) which is certified if the claim is for more than $100,000. Defendant alleges that plaintiffs have failed to meet the requirements above in several respects, including: a) plaintiffs' attorney filed their claims, not plaintiffs themselves; b) the claims were not for a sum certain; c) the claims were submitted to the wrong contracting officer; d) the claims were not received by the contracting officer on a timely basis; and e) the claims were not certified.

As stated earlier in the Facts section, *supra*, plaintiffs, through their attorney, filed a single Notice of Claims letter ("the claims letter") containing attachments, *infra*, on June 28, 1999, with Richard Zephier, the regional contracting officer for the BIA at the GPRO (Great Plains Regional Office) in Aberdeen, South Dakota. The letter clearly stated that each plaintiff was filing *individual* breach of contract claims relating to their

respective contracts and enclosed copies of each contract. Additionally, plaintiffs included in their pleadings filed with this court, a copy of a certified postal receipt which establishes that the claims letter was received by the BIA on July 1, 1999. Defendant has not produced any evidence that Mr. Zephier ever rendered a decision on the claims and, indeed, concedes that such was never made. We also note that plaintiffs' initial complaint in this court was filed on October 5, 1999, long after the required sixty (60) day waiting period for a decision by the contracting officer. We will now analyze each of defendant's contentions above seriatim.

■ First, the court rejects defendant's position that the claims letter is invalid because it was filed by plaintiffs' attorney. Subsection (7) of § 605(c), *supra*, states that "the certification required by paragraph (1) may be executed by any person duly authorized to bind the contractor with respect to the claim." *Id.* Applying this rule regarding certification to the issue of who can properly file a claim on behalf of a contractor, the court concludes *a fortiori* that plaintiffs' duly authorized attorney is a proper person under the CDA. Moreover, this court has stated: "Section 605(a) is written in the passive voice. It merely requires that the written claim 'be submitted' to the contracting officer for a decision; it does not specify *who* must submit the claim to the contracting officer." *Tri–Ad Const. v. United States*, 21 Cl.Ct. 789, 792 (1990) (emphasis added).

■ Second, the court rejects defendant's contention that the claims letter does not specify a sum certain. Actually, the claims letter makes reference to the enclosed contracts and the court has no reason to doubt that such contracts were included with it. Each contract specifies the exact amount of monetary compensation each respective plaintiff was to receive under it, to wit, a sum certain. Speaking on the issue of form, the Federal Circuit stated:

> We know of no requirement in the Disputes Act that a "claim" must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.

*Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987). Accordingly, considering the pleadings in the most favorable light to plaintiffs on this issue, the court concludes that plaintiffs' claims letter sufficiently stated a sum certain because the enclosed contracts which were the basis of their claims reflect the exact dollar amounts.

■ Third, the court rejects defendant's contention that the claims letter was sent to the wrong contracting officer. Defendant has not stated anywhere in its pleadings who was the proper contracting officer or where plaintiffs should have sent their claims letter. Defendant only states that Mr. Zephier is not the correct contracting officer in a hospitable attempt to find refuge in bureaucracy. From a review of the geographical location of the GPRO in Aberdeen, South Dakota, in relation to the location of Standing Rock Reservation, the court notes that the GPRO is in reasonable proximity to the reservation and is, most likely, the closest locale to the reservation containing a BIA contracting officer. As plaintiffs have averred that Mr. Zephier is the proper contracting officer and defendant has submitted no evidence which would lead us to doubt this assertion, the court holds that, in construing the pleadings in the most favorable light to plaintiffs on this issue, Mr. Zephier was the proper contracting officer.

If, however, Mr. Zephier was, in fact, not the correct contracting officer, we note that defendant had ample opportunity to remedy such a situation. Regarding the very same issue, this court has stated:

> The term "submit" [under § 605(a)] means "to commit to another (as for decision or judgment)." "Submit" is not entirely synonymous with the words "address" or "directly send." A contractor may submit a claim without necessarily sending the papers *directly* to the contracting officer.

*Tri–Ad Constr.*, 21 Cl.Ct. at 792 (citations omitted) (emphasis added). Those in charge

of administering contracts at the GPRO could have easily sent plaintiffs' claims letter to the correct contracting officer if, indeed, it was addressed erroneously to Mr. Zephier. It is plaintiffs here, who are on the non-movant side of this instant motion to dismiss, who deservedly receive the court's 'benefit of the doubt' on this issue.

Fourth, the court rejects defendant's contention that Mr. Zephier received the claims letter untimely. As plaintiffs' pleadings show by attached postal receipt, the claims letter was received and signed for by the GPRO mail room on July 1, 1999, a few days from the June 28, 1999 date shown on said letter. Incredibly, defendant attempts to place the onus on plaintiffs for Mr. Zephier's failure to receive the letter timely based on the GPRO's mismanaged administrative procedure. This position brings to mind plaintiffs' allegation that for defendant "[t]o now seek to avoid their failure to honor these contracts by seeking a tortured construction of the CDA is disingenuous at best and dishonorable at worst." Pls' Resp. to Mot. to Dis. at 3. While we do not embrace this strong assertion of plaintiffs, we are constrained to hold that defendant's questionable contention on this issue must be rejected outright.

█ Finally, the court also rejects defendant's contention that plaintiffs' claims letter was not properly certified. As is shown above, proper certification is, indeed, required only for claims above $100,000. 41 U.S.C. § 605(c)(1). The Federal Circuit has upheld this requirement, stating that: "proper certification [of a CDA claim] is a jurisdictional prerequisite." *Johnson Controls v. Garrett*, 987 F.2d 738, 741 (1993). Plaintiffs' collective claims, however, only total more than $100,000 *in the aggregate*. As the claims letter clearly states, to wit, "we are filing *individual* contract claims with you, as the contracting officer," the court considers each contract dispute as a separate claim and each plaintiff as a separate contractor. Attachment to Pls'. Resp. to Mot. to Dis. (emphasis added). Consequently, no individual claim is more than $100,000, thus separate certification thereof is not required.

We arrive at this conclusion considering the Federal Circuit's holding in *Contract Cleaning*, cited above, which states that there is "no requirement that a 'claim' must be submitted in any particular form or use any particular wording." 811 F.2d at 592. This holding was explained further in *Placeway Const. Corp. v. United States*, which stated—"[w]e *neither stated nor implied* [in *Contract Cleaning*], however, that it is the *form* of the submission of claims that determines whether the *claim is unitary*." 920 F.2d 903, 908 (1990) (holding that Claims Court erred in ruling that multiple claims filed together were unitary and thus had to be certified) (emphasis added). In light of these two decisions, the court is of the opinion that, despite the fact that in form plaintiffs' claims are all stated on one claims letter, they are, indeed, separate expressed claims for relief.

As a consequence of all the foregoing, this court holds that plaintiffs have met the jurisdictional prerequisites of jurisdiction required by 41 U.S.C. § 605 and, thus, defendant's argument that they have failed to do so is hereby rejected.

C. *Exhaustion of Administrative Remedies is Inapplicable to the Case at Bar*

█ Defendant argues that the court does not have subject matter jurisdiction over plaintiffs' claims because plaintiffs failed to exhaust their available administrative remedies. Particularly, defendant states the following to support this position:

The appeal rights, severance, and other benefits *outlined by the BIA [in the BIAM] are the exclusive remedies* made available to Federal employees [like plaintiffs] for personnel-related claims. To the extent that plaintiffs are seeking equitable, non-monetary relief, or compensatory damages, including salaries and benefits to which they claim to be entitled beyond the severance and/or other payments which they have received, those claims could have been pursued under the negotiated grievance procedure as outlined in the RIF notices, *and their complaint would be barred under the Civil Service Reform Act ("CSRA")* .... The remedies available to

Federal employees under the CSRA provide an exclusive remedy, which bars suit for ... money damages under either ... the Contract Disputes Act, [or] the Tucker Act ....

Def's Mot. to Dis. at 10 (emphasis added). In sum, the court interprets this statement as an argument that plaintiffs have failed to exhaust their administrative remedies under both the CSRA and the procedures outlined by the BIA in 62 BIAM 11. *See supra* at 421. As will be demonstrated below, these contentions are untenable.

The Federal Circuit has stated that "[b]y 25 U.S.C. § 2011(a)(1) [now § 2012(a)(1)] Congress excluded BIA educators [like plaintiffs] from the coverage of those provisions of the Civil Service Reform Act of 1978 (CSRA) that relate to the appointment, promotion and *removal of* civil service employees." *Volk v. Hobson*, 866 F.2d 1398, 1401 (Fed. Cir.1989) (suit by BIA educator against the BIA and administrators) (emphasis added). This holding was reiterated by the same Court in 1999. *Wilhoite v. Merit Sys. Prot. Bd.*, 194 F.3d 1339 (Fed.Cir.1999) (unpublished opinion). Indeed, these cases are correct as § 2012, the statute that provides the procedural framework for the BIA in administering Native–American educational programs, states:

> Chapter 51, subchapter III of chapter 53, and chapter 63 of Title 5 [of the CSRA], relating to classification, pay, and leave, respectively, and the sections of such title relating to the appointment, promotion, and removal of civil service employees, *shall not apply to educators* or to education positions (as defined in subsection (n) of this section [and similarly defined by the BIAM]).

25 U.S.C. § 2012(a)(1) (emphasis added).

Consequently, plaintiffs simply are not covered by the procedural framework of the CSRA. Defendant has not cited a single case that holds otherwise, nor has defendant cited a single case that the CSRA, for that matter, would divest this court of jurisdiction *under the CDA specifically* even if it did apply to BIA educators. Accordingly, defendant's position that plaintiffs have failed to exhaust their administrative remedies under the

CSRA is rejected. The court will now turn to defendant's argument that plaintiffs failed to exhaust their administrative remedies under 62 BIAM 11.

As mentioned earlier, 62 BIAM 11, promulgated pursuant to 25 U.S.C. § 2012, articulates the internal procedures of the BIA in administering the agency's education programs. Particularly, it includes a grievance procedure that educators may use to challenge their separations from service. 62 BIAM 11.43, 11.8–9. It is these procedures that defendant alleges plaintiffs have failed to exhaust.

■ Regarding the exhaustion doctrine generally, this court has stated:

> The doctrine of exhaustion of administrative remedies (exhaustion doctrine) provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. This court has determined that administrative remedies are not considered to be exhausted until a claim is filed [with the agency], a decision made, and the agency appellate process, at the least, has begun.

*Lewis v. United States*, 32 Fed.Cl. 59, 64 (1994) (citations omitted).

■ There is, however, an important exception to this rule, which was stated by the above court. Under this exception, "if the statute [a plaintiff files under] does not specifically mandate the exhaustion of remedies, then the reviewing court has jurisdiction over claims filed by aggrieved parties who have failed to exhaust their administrative remedies." *Id.* Plaintiffs' action falls squarely in this exception. The CDA does not mention any requirement by a contractor to exhaust administrative procedures under any scenario beyond what is contained in § 605. What jurisdictional prerequisites § 605 does require, have, as shown earlier, been already satisfied by plaintiffs.

■ Plaintiffs did not file their amended complaint in this court under either 62 BIAM 11 or 25 U.S.C. § 2012, but the CDA, and this is an important distinction. While the BIAM may require certain procedures for

aggrieved educators, it simply will not divest this court of jurisdiction over claims that are otherwise valid under the CDA, a statute promulgated by Congress which gives this court jurisdiction over specific contract claims. Moreover, neither the BIAM, nor § 2012, specifically state that they take precedence over the CDA in a contractual dispute context. Consequently, we reject defendant's argument that plaintiffs' failure to exhaust their administrative remedies under the BIAM divests this court of jurisdiction under the CDA.

### CONCLUSION

Given all of the foregoing, defendant's RCFC 12(b)(1) motion to dismiss is hereby DENIED for the following reasons: (1) plaintiffs' contracts are covered under the CDA; (2) plaintiffs have fulfilled the jurisdictional prerequisites required under the CDA; and (3) plaintiffs are not required to exhaust any additional administrative remedies under the CDA. Consequently, the parties shall file a joint status report with the court on or before June 6, 2001, advising their views as to how this case shall now proceed, with a proposed timetable relative thereto.

IT IS SO ORDERED.